UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SONYA L. HALL, | ) | CASE NO.  1:07cv649 |
| | ) | |
| Plaintiff | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| NATIONAL CITY CORPORATION | ) | **MEMORANDUM OF OPINION** |
| WELFARE BENEFITS PLAN, | ) | **AND ORDER** |
| | ) | [Resolving Docs. 40, 45, 46] |
| Defendant. | ) | |
| | ) | |

Before the Court is Plaintiff's Motion for Judgment Awarding Benefits (Doc. 40) and

Defendant's Motion for Judgment on the Administrative Record (Doc. 45), as well as a related

Motion to Strike (Doc. 46).  The Court has been informed, having reviewed the pending motions

and the opposition thereto, the pleadings, the administrative record, and applicable law, and now

DENIES Plaintiff's Motion for Judgment Awarding Benefits (Doc. 40), GRANTS Defendant's

Motion to Strike (Doc. 46), and GRANTS IN PART Defendant's Motion for Judgment on the

Administrative Record (Doc. 45).

## FACTS

Plaintiff was a full-time employee of National City Corporation (NCC), where the last

position that she held was that of Fiduciary Specialist.  The parties do not dispute that, as a full-

time employee, Plaintiff qualified for benefits under the National City Corporation Welfare

Benefits Plan ("the Plan").  In March 2000[1], she underwent a fusion of the C5 and C6 vertebrae.

---

[1] Some of the medical records indicate that she underwent the C5-6 fusion in March 2000, but one record, namely the Independent Medical Examination by Dr. Cremer notes that the procedure took place in June 2000.

While it is not clear from the parties' statements of fact or from the record what occurred between March 2000 and May 2001[2], it is clear that Plaintiff's pain caused her to seek short-term disability benefits ("STD") in May 2001, which she received effective July 3, 2001. (AR 353)[3]. On October 20, 2001, Liberty Mutual ("Liberty"), the third party claims administrator, informed Plaintiff by letter that she would receive long-term disability ("LTD") benefits in monthly payments of $2333.45 beginning on November 19, 2001. (AR 296). In accordance with the terms of the Plan, the letter informed Plaintiff that she was required to apply for Social Security benefits which, if approved, would offset the amount paid in benefits by the Plan. *Id.* Further, it informed her that continued receipt of long-term disability benefits was dependent upon the certification of continued disability. *Id.*

In January 2002, Plaintiff underwent an evaluation by Dr. Michael Harris for purposes of her social security benefits application. Dr. Harris concluded that Plaintiff was "functionally severely limited," and that she could not tolerate working an eight-hour day. (AR 743). Nevertheless, on March 26, 2002, the Social Security Administration ("SSA") denied Plaintiff's claim for social security benefits.

After Plaintiff received benefits for a continuous two-year period, she was notified in a December 20, 2002, letter from Liberty that she was required to undergo an evaluation to determine whether she still met the definition of "totally disabled." (AR 221). Under the language of the Plan, totally disabled meant that a participant was "unable to perform, with reasonable continuity, all of the duties of any occupation for which a Disabled Participant is or could become qualified by education, training and experience, as determined by the Plan

---

[2] Defendant's Motion (Doc. 45) indicates that Plaintiff returned to work part-time from November 2000 to May 21, 2001 (see Defendant's Motion, p. 2), but gives no citation to the extensive record to support that rendition. Plaintiff does not mention any return to work after the March 2000 cervical fusion.
[3] Citations to "AR" indicate the Bates stamped documents in the Administrative Record.

2

Administrator in its discretion."  (AR 54).  As part of the review process, Plaintiff underwent an

Independent  Medical  Examination  (IME)  with  Dr.  Stephen  Cremer  on  June  17,  2003.   Dr.

Cremer concluded that she was totally disabled from her previous work, noting that

> [a]t the current time it is felt that this claimant cannot return to work in her
> previous  job  status  without  restrictions. . . .   [T]his  individual  is  felt  to  be
> currently totally disabled from her previous work.  A job in which she has regular
> change  in  position,  the  ability  to  sit,  stand  or  walk  as  necessary  would  be
> considered.  This would likely be on a four hour a day basis for the current time.
> If pain can be mitigated . . . returning to full duty is still felt to be possible.

(AR 738).

Liberty informed Plaintiff by letter dated July 3, 2003, that she would continue to receive

LTD benefits, and that there would be periodic re-evaluations to verify that she still met the

Plan's disability definition.  (AR 174).  In 2005, as part of a review, Liberty sent Plaintiff's file

to Dr. Gale G. Brown, Jr., who is Board Certified in Physical Medicine & Rehabilitation and

Internal  Medicine,  and  Dr.  Peter  M.  Mirkin,  who  is  certified  by  the  American  Board  of

Psychiatry and Neurology, to obtain their opinions.  (AR 488, 495).

Dr. Brown's opinion, which was based upon a file review, was issued on October 21,

2005.  According to her report, Dr. Brown considered reports and file notes from at least seven

different  doctors  spanning  the  years  2001  to  2005,  including  those  of  Plaintiff's  treating

physician.  (AR 490).  She concluded that Plaintiff was impaired by C6-7 radiculopathy, but that

"[f]rom a physical perspective, assuming sufficient motivation, [Plaintiff] should be capable of

performing full-time sedentary work, with accommodation for the restrictions outlined in [the]

report."  (AR 490).

Dr.  Brown  noted  the  report  by  Dr.  Winer,  Plaintiff's  treating  physician,  in  which  he

commented that Plaintiff could not work an eight-hour day, as well as Dr. Morganstern-Clarren's

report of June 6, 2005, stating that Plaintiff could not maintain meaningful work.[4]  However, Dr.
Brown found that Plaintiff's objective physical condition and stated activities as reflected in the
reports she reviewed did not support a finding that she could perform no work.  Instead, she
found that Plaintiff's complaints were of subjective physiological and possibly psychological
problems owing to pain and to the side effects of the medication she took for that pain.  (AR 491-
492).  These complaints Dr. Brown considered difficult to substantiate given Plaintiff's admitted
physical activity levels, both because the level of pain she indicated was not commensurate with
the types and duration of activities in which she engaged, and because the degree of her
complaints of cognitive difficulty would have precluded the types of activity in which she
admittedly engaged, such as driving, walking, and reading.

Similarly, Dr. Mirkin reviewed Plaintiff's medical records, including those of her
neurologists and psychiatrists, as well as the record of the IME performed by Dr. Cremer, the
Administrative Law Judge's decision denying social security benefits, and the office notes of
Drs. Winer and Morgenstern-Clarren.  (AR 484-88).  He determined that Plaintiff's GAF score
of 38 was unsupported by the few symptoms noted by her health care providers.  (AR 483).
Such a low score, he remarked, would have resulted from symptoms such as "impaired speech"
or "delusions or hallucinations," which Plaintiff's records did not reflect.  (AR 483-84).  He did
acknowledge that she had been treated for depression, but found that her symptoms generally
arose in the context of stressful events in her life, such as her divorce, and that she responded
well to low levels of medication.  (AR 483).  He commented that Plaintiff did have "episodic
mild symptoms of sleep disturbance and crying spells related to her stressful life events and pain,
but the descriptions of these symptoms in her records are not at a level that would totally prevent

---

[4] Dr. Brown indicated that Dr. Morganstern-Clarren's notes detailing any support for this finding were "handwritten
and of poor copy quality."

4

her from performing any and all occupational functions."  (AR 484).  Finally, he concluded that "[h]er records do not describe a psychiatric condition of such severity that she would be prevented from performing in a sedentary, non-stressful occupation even in combination with her other physical complaints."  (AR 483).

As part of its review, Liberty also requested a Transferable Skills Analysis from vocational expert Jonathan Fandel.  On January 4, 2006, Mr. Fandel issued a report stating that Plaintiff would be capable of performing the following occupations:  receptionist at a small office or business, new account clerk, information clerk, or accounting clerk.  (AR 480).  His opinion was based upon medical records from Plaintiff's treating physician as well as the physical restrictions set forth by Dr. Brown in her report.  (AR 479).

Liberty concluded that Plaintiff no longer qualified for LTD benefits, and so informed her by letter on May 3, 2006.  In its letter, Liberty set forth the requirements for qualifying for LTD benefits, the information gleaned from its review regarding her health condition, and her right to appeal its decision as well as the procedure for appeal.  (AR 413-416).  Plaintiff appealed Liberty's decision on June 19, 2006.  (AR 683-87).  The majority of the medical records to which Plaintiff pointed in support of that appeal dated from 2001 to 2004.  In particular, Plaintiff noted Dr. Harris's 2002 report in which he indicated that Plaintiff could not tolerate an eight-hour workday, and Dr. Winer's reports from 2002 to 2004 in which he identified Plaintiff's complaints and their likely sources.  Plaintiff then contended that Dr. Winer had not provided a physical capacity form between September 2003 and March 2006, but that in the March form he wrote that Plaintiff's estimated return to work date was "not applicable."  Plaintiff also included with her appeal a report from a vocational expert, William T. Cody, who, based upon a file

5

review, noted that Plaintiff's own physician had opined that she was not capable of working. (AR 751-54).

Liberty reviewed Plaintiff's appeal, the documents submitted with her appeal, and her case file.  As part of that process, Liberty sought review by its independent medical panel, which included Drs. Stephen C. Vanna and Judith Willis, both of whom are Board Certified in Psychiatry and Neurology.  (AR 643-47, 649-51).  Both experts were asked to opine on the question of whether Plaintiff was totally disabled under the terms of the plan.  Dr. Willis concluded that Plaintiff did not meet the definition of totally disabled, citing the reports of Dr. Winer, one of which stated that Plaintiff could "sit, push, pull, reach, grasp, and repetitively move her wrist, elbow, shoulder and ankle frequently, stand, walk, and occasionally, drive up to two hours," and another from April 2006 concluding that Plaintiff could work as a clerk.  (AR 645-46).  She also noted the April 2006 report of Dr. Colombi, a neurosurgeon, in which he stated that her MRI was "completely normal in every way" and showed no surgically correctable problem.  (AR 645-46).

Dr. Vanna reached a similar conclusion, adding that Dr. Winer had told him over the phone that Plaintiff exhibited "'some disability, but probably not totally disabled.'"  (AR 649). Based upon his review, Dr. Vanna suggested that further treatment for the pain, while not curative, "would get [Plaintiff] back to work."  (AR 650).  He ultimately opined that "[a]ll of [Plaintiff's] complaints are of a subjective nature and, therefore, she is not totally or permanently disabled in a reasonably stable job market."  (AR 650).  Based upon its own review and the review of its independent experts, Liberty denied Plaintiff's appeal.

6

## LEGAL ANALYSIS

Plaintiff filed her complaint with this Court (Doc. 1) on March 5, 2007.  In it, she acknowledged that the Plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.  Plaintiff subsequently filed an Amended Complaint (Doc. 27), to which Defendant filed its Answer (Doc. 28) on September 12, 2007.  Upon motion by Defendant, the Court dismissed Plaintiff's breach of fiduciary duty claim from her Amended Complaint.  (Doc. 36).  Now pending before the Court are Plaintiff's Motion for Judgment Awarding Benefits ("Motion for Benefits") (Doc. 40); Defendant's Motion for Judgment on the Administrative Record ("Motion for Judgment") (Doc. 45); and Defendant's Motion to Strike the exhibits Plaintiff attached to her Motion for Judgment (Doc. 46).

### I.      Motion for Benefits and Motion for Judgment

In her Motion for Benefits and her Opposition to Defendant's Motion for Judgment, Plaintiff enumerated many issues for this Court's review.  Those issues are set forth below, and, for the sake of clarity, will be re-ordered and consolidated where possible.

In her rather disjointed Motion for Benefits, Plaintiff raises the following issues for review, which she then addresses in no particular order:

Issue I:       Whether the Plan language is sufficient to give discretion to the named fiduciary.

Issue II:      Whether the de novo or the arbitrary and capricious standard should be used even if the Plan might have discretionary language because giving deference to a non-Article III tribunal violates [Plaintiff's] constitutional rights for a plenary review under the statute.

Issue III:     Whether [Plaintiff's] medical limitation and vocational abilities prevent her from performing with reasonable continuity all of the duties of Any Occupation for which she is, or could become, qualified by education, training or experience.

Issue IV:    Whether the denial, if viewed under the arbitrary and capricious standard, is a benefits decision that was made solely for [Plaintiff's] benefit and based upon deliberate, principled reasoning supported by substantial evidence considering the quality and quantity of the medical and vocational evidence before the Court.

Issue V:     Whether National City, through Liberty, gave [Plaintiff] a denial notification that put her on notice of the true and accurate reasons [upon which] her denial was based and adequately advised her of the information necessary for her to have her claim paid and an explanation of why such material or information was necessary.

Issue VI:    Whether, after awarding [Plaintiff] benefits under the Any Occupation definition of the Plan and paying these benefits for three years, the medical and vocational evidence before termination of benefits prove that [Plaintiff's] condition was sufficiently improved to justify the termination of long-term benefits that had been awarded and paid because she had a change in her physical condition that justified re-evaluating her vocational abilities sufficient to prove that she could, with reasonable continuity, sustain all of the duties of any occupation for which she was or could become qualified by education, training, and experience.

Issue VII:   Whether the Defendant, National City, provided [Plaintiff] with the statutorily required full and fair hearing that permitted her to review and comment on all of the documents and, in turn, [whether] National City in its decision considered all of the opinions, comments, documents, records, and other information provided by [Plaintiff] in her appeal thereby ensuring a full, fair, and complete review required by 29 U.S.C. § 1133.

In its Motion for Judgment, Defendant responded to the claims made by Plaintiff in her Motion for Benefits, and also moved this Court to find that it is entitled to judgment on Plaintiff's claims and on its Counterclaim for a reimbursement or set-off of what it characterized as over-payments made to Plaintiff.

In her Opposition to Defendant's Motion for Judgment, Plaintiff raised the following issues, most of which are similar to if not the same as those raised in her Motion for Benefits, and are similarly scattered in their discussion:

8

Issue 1:     Whether National City complied with it[s] statutory obligations and the terms of the Plan when the determination of benefits must be made on the language of the Plan.

Issue 2:     Whether [Plaintiff's] denial of benefits [. . .] based on her medical limitations and vocational skills is established with evidence that is competent under the definition in the Plan[.]

Issue 3:     Whether the denial, if viewed under the arbitrary and capricious standard, is a benefits decision that was made solely for [Plaintiff's] benefit and based upon deliberate, principled reasoning supported by substantial evidence considering the quality and quantity of the medical and vocational evidence before the Court.

Issue 4:     Whether the Defendant, National City, provided [Plaintiff] with the statutorily required full and fair hearing that permitted her to review and comment on all of the documents and, in turn, [whether] National City in its decision considered all of the opinions, comments, documents, records, and other information provided by [Plaintiff] in her appeal thereby ensuring a full, fair, and complete review required by 29 U.S.C. § 1133.

The Court characterizes the issues before it as follows:  (1) whether the arbitrary and capricious standard is properly applied in this case; (2) whether the determination by the Plan to terminate Plaintiff's benefits was proper, both initially and upon Plaintiff's appeal to the committee[5]; (3) whether the notice and opportunity for hearing regarding termination of benefits was sufficient[6]; (4) whether the Plan is entitled to reimbursement for purported overpayment of LTD benefits to Plaintiff.

**A.      Plan Administrator's discretion**

When reviewing a plan administrator's decision to deny benefits, a court "review[s] *de novo* the plan administrator's denial of ERISA benefits, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms

---

[5] This issue comprehends each of Plaintiff's Issues III, IV, VI and VII from her Motion for Benefits, as well as Issues 1, 2, 3 and 4 from her Opposition to Defendant's Motion for Judgment.
[6] This issue comprehends each of Plaintiff's Issues V and VII from her Motion for Benefits, and Issue 4 from her Opposition to Defendant's Motion for Judgment.

of the plan." *Wilkins v. Baptist Health Care Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998).  If the

plan administrator is given discretion to construe the terms of the plan, the court reviews the

decision under the deferential arbitrary and capricious standard.  *Gismondi v. United Techs.*

*Corp.*, 408 F.3d 295, 298 (6th Cir. 2005); *see also Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 115 (1989).

> In the instant case, the Summary Plan Description contains the following language:

> National City Corporation is the Plan Sponsor and Plan Administrator for all
> National City benefit plans and programs.  Under the terms of each plan, the Plan
> Administrator has full discretion and authority to determine eligibility for
> benefits, to interpret the provisions of the plan and to control and manage the
> operation of the plan.

(AR 27).  The Plan includes the following language:  "The Plan Administrator . . . shall have the

following . . . powers: (a) to construe and interpret this Plan and to decide all questions of

eligibility[.]"  (AR 50).

> Plaintiff states in her Motion for Benefits that she "does not believe the Plan contains

adequate language," but cites no case law and makes no argument to support that belief.  Based

upon the Plan's plain language, the Court finds that the Plan Administrator has been granted the

discretion and authority to construe the terms of the Plan.

> In light of this finding, the Court rejects Plaintiff's contention that the Plan's benefit

decision should be reviewed *de novo*, and finds that review of the benefit decision in this case is

subject to the arbitrary and capricious standard, which requires that, if a benefits decision is

"rational in light of the plan's provisions," it must be upheld.  *Yeager v. Reliance Standard Life*

*Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (internal citations omitted).  In other words, "[w]hen it

is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that

outcome is not arbitrary or capricious."  *Davis v. Ky. Fin. Co. Ret. Plan*, 887 F.2d 689, 693 (6th

Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (6th Cir. 1985)).  However, this standard still requires that the reviewing court consider the "quality and quantity of the medical evidence and the opinions on both sides of the issues."  *Bennett v. Kemper Nat. Servs. Inc.*, 514 F.3d 547, 553 (6th Cir. 2008) (citing *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *cert. granted*, 128 S.Ct. 1117 (Jan. 18, 2008) (cert. granted only as to conflict of interest issue)) (internal quotations omitted).

Plaintiff makes a protracted argument regarding the constitutionality of the arbitrary and capricious standard.  She contends that ERISA (particularly 29 U.S.C. § 1132) confers statutory rights, and that therefore anything less than a plenary review by an Article III judge is unconstitutional.  She further argues that the United States Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), has improperly permitted plans to include discretionary language on the basis of a misguided analogy to trust law.

The ERISA statute nowhere guarantees a plenary review by an Article III judge.  The provision to which Plaintiff cites does give jurisdiction for review to an Article III judge, but does not guarantee that such review will be plenary.  At no point after the discussion in *Firestone* have the courts revisited the principle that the arbitrary and capricious standard should be applied to decisions made by plan administrators to whom discretion is given, and this Court declines to undertake that task now.

**B.     Decision to terminate benefits**

Under the arbitrary and capricious standard, which the Court has found it must apply to the instant case, the Court must uphold the Plan's decision to terminate benefits "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  *Bennett*, 514 F.3d at 552, quoting *Glenn*, 461 F.3d at 666.  "When determining whether a

decision was arbitrary or capricious, we also factor in whether there existed a conflict of interest, whether the plan administrator failed to give consideration to the Social Security Administration's determination that the applicant was totally disabled, and whether the plan administrator based its decision to deny benefits on a file review as opposed to conducting a physical examination of the applicant." *Bennett*, 514 F.3d at 553 (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir.2005)). The Court notes that, in the ERISA context, a plaintiff who challenges the denial of benefits bears the burden of demonstrating he is disabled from performing any occupation for which he is qualified by education, training or experience. *Rose v. Hartford Fin. Servs. Group*, 2008 FED App. 0144N at *22 (6th Cir. 2008); s*ee also Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 Fed. Appx. 511, 516 n. 4 (6th Cir. 2006).

Plaintiff contends that the Plan Administrator failed to consider all of Plaintiff's medical records in making its decision to terminate her benefits, and that it improperly relied upon a file review rather than conducting a physical examination. She points to the fact that the Plan Sponsor and Plan Administrator were the same entity as proof that a conflict of interest existed. Finally, she argues that the Plan Administrator made its decision despite the Social Security Administration's reconsideration of Plaintiff's case, after which it reversed its earlier decision and found Plaintiff disabled. The Court will deal with each of these issues separately.

### 1.    Adequacy of review

In its letter informing Plaintiff of the denial of benefits, Liberty noted that it had relied upon the opinions of its medical experts and on its review of Plaintiff's claim file, including her medical records. It cited the Plan's definition of totally disabled, which Plaintiff would have had to satisfy in order to continue receiving benefits: "'Totally disabled' means unable to perform, with reasonable continuity, all of the duties of any occupation for which a Disabled Participant is

or could become qualified by education, training and experience, as determined by the Plan Administrator in its discretion." (AR 413).

Plaintiff's treating physician, Dr. Winer, had reported in January 2006, that, while desk work was not feasible because of Plaintiff's cervical fusion operation, her estimated return to work date was July 1, 2006. (AR 473). On April 4, 2006, Dr. Colombi reported to Dr. Winer the results of the MRI he had performed on Plaintiff, which, according to Dr. Colombi, was "completely normal in every way." (AR 419). Dr. Winer reviewed the results of that MRI and concurred that it was "completely normal." (AR 420). Later, on April 18, 2006, Dr. Winer noted that he was "being asked to comment on long-term disability benefits in reference to her job. She can do accounting clerk work and informational clerk, etc." (AR 417). These were the most recent medical records in Plaintiff's file, and, standing alone, support the Plan Administrator's decision to deny benefits, as two treating physicians concur that there is no abnormality reflected in her tests, and her main treating physician indicates that she can work.

Plaintiff points to other medical records that she claims were not considered by the Plan Administrator. First, she contends that it failed to consider Dr. Cremer's IME, dated June 17, 2003, and Dr. Harris's IME, conducted in January 2002 for use in her social security claim. She cites to the District Court's decision in *Pelchat v. UNUM Life Ins. Co. of Amer.*, 2003 U.S. Dist. LEXIS 8095, to support a contention that a plan administrator may not selectively adopt particular findings of a medical expert and reject later opinions. However, her reliance upon *Pelchat* is misguided. In *Pelchat*, the plan administrator accepted a significantly restricted return to work form from a physician, which was given to a plaintiff who had been unable to obtain benefits, but rejected a later determination by that doctor that the plaintiff was disabled and could not work. That is not the case here. Plaintiff's own treating physicians came to the conclusion

13

that she was not disabled several years after the examinations upon which Plaintiff relies, and after Plaintiff had undergone extensive treatment for her condition.  Further, even Dr. Cremer opined in his IME report – on portions of which Plaintiff relies heavily – that a return to work was still possible if Plaintiff's pain were mitigated.  (AR 738).  The reports upon which Liberty has relied are the most recent medical reports in Plaintiff's file, distinguishing this situation from that in *Pelchat*.

Plaintiff also argues that, without evidence of improvement, the LTD benefits previously paid by Defendant could not be denied.  Further, she states that "the plan definition of disability insists that an IME by a clinician with a hands-on examination be done to validate [a] termination" of benefits.  Notably, Plaintiff does not cite to the Plan's language in support of that assertion.  Based upon this Court's review of the Plan as provided in the Administrative Record, Plaintiff cannot support that contention because she has misrepresented the Plan's language.

The Plan defines disability as an "inability, by reason of a medically determinable physical or mental impairment, to engage in substantial and gainful activity."  (AR 52).  The definition of disability in the Summary Plan Description ("SPD") similarly does not support Plaintiff's claim that a physical examination be performed as part of an IME in order for benefits to be terminated.  Instead, it explains that a person is disabled within the first two years of receiving benefits if he cannot perform the duties of his own job.  After two years, a person is disabled only if he cannot perform the duties of any occupation for which he is or could become qualified with training or experience.  (AR 8).  The SPD clearly states that, in determining whether a person meets the definition of disabled, the Plan Administrator is given discretion.

The section of the Plan to which Plaintiff appears to point in support of her assertion is that quoted in Liberty's letter informing Plaintiff of the denial of benefits. However, Plaintiff has selectively quoted that language, which reads in its entirety as follows:

> A Participant's continued eligibility for Long-Term Disability benefits is conditioned upon the Participant's furnishing to the Named Fiduciary, at the time the Participant makes a claim for benefits and from time to time thereafter at the Named Fiduciary's request, medical verification of the Long-Term Disability satisfactory to the Plan Administrator, obtained from medical examinations made by a physician or other health care provider selected by the Named Fiduciary and reasonably acceptable to the Participant. At the request of the Named Fiduciary in its discretion, such examination shall be conducted by a physician or health care provider other than the Participant's own treating physician. Such examinations shall be designed to enable the plan administrator to determine, during the first two years from the inception of the Disability, whether the Participant is able to perform all of the material duties of the Participant's particular occupation with the Participant's Employer and following that two-year period, whether the [P]articipant is Totally Disabled.

(AR 413). The Plan is not required to request a physical examination of a participant by an independent expert. Instead, the Plan clearly states that any examinations may be performed, at the discretion of the Named Fiduciary, by someone other than a participant's treating physician.

In this case, Plaintiff's treating physicians provided a series of records to Liberty, including reports that concluded that Plaintiff was capable of working. Plaintiff may hope to give a tortured interpretation to the reports of Drs. Winer and Colombi[7], but the Court is not persuaded. These physicians indicated that her exams in March and April 2006 were objectively normal, and that she was capable of returning to work. Plaintiff cites a number of cases to support her argument that disability benefits cannot be discontinued without evidence of improvement. The Court acknowledges this line of precedent, and finds that Plaintiff's physicians' reports in 2006 constitute evidence of improvement, and, when read in accordance

---

[7] Plaintiff has attempted to argue that Dr. Winer was not actually opining that Plaintiff could perform clerk work, but that he was simply stating what he was being asked to consider. That is not the plain reading of Dr. Winer's statement, which reads, "[W]e are being asked to comment on long-term disability benefits in reference to her job. She can do accounting clerk work and informational clerk, etc." (AR 417).

15

with their plain meaning, support the Plan Administrator's decision to terminate Plaintiff's benefits.  In the face of such evidence, and absent anything more than her heavy reliance upon medical records from 2001 to 2003, the Court finds that Plaintiff has simply failed to meet her burden of demonstrating a disability.

Although Plaintiff also pursued an appeal to the committee, and has challenged the adequacy of that review, the Court finds that the review on appeal was also principled and reasonable under the arbitrary and capricious standard.  In support her appeal, Plaintiff submitted a brief challenging the Plan's decision, as well as the findings of her own vocational expert and the new opinion from the Social Security Administration (SSA) finding her disabled.[8]  In addition, she submitted a comment from Dr. Winer that read "[n]eeds functional capacity evaluation," and argued in her brief that this comment negated Dr. Winer's earlier statements regarding Plaintiff's physical capacity and his opinion that she could perform sedentary work.

As part of the appeal review, the Plan Administrator employed Drs. Vanna and Willis to review her file.  Both concluded that Plaintiff was not disabled.  Dr. Vanna referred to a telephone call to Dr. Winer in which the latter reportedly opined that Plaintiff had some disability but probably was not totally disabled.  (AR 649).  Both Drs. Vanna and Willis came to the conclusion that Plaintiff was not disabled.

Plaintiff contends that this review did not take into account her own vocational expert's report or the reversal by the SSA finding Plaintiff disabled, and that the phone call to which Dr. Vanna referred was improperly considered.  As will be discussed below, the SSA cites nothing from the record and gives no reasons in support of its 2006 finding.  Plaintiff's vocational expert

---

[8] The Administrative Record in this case includes two SSA opinions, one issued October 19, 2004, in which the Administrative Law Judge found Plaintiff not to be disabled (which Plaintiff unsuccessfully appealed) (AR 904-917), and one issued in September 2006, reversing the earlier opinion and determining that Plaintiff was disabled. (AR 673-675).  There are no reasons stated in the second opinion for the reversal of the judgment.

relies heavily on Plaintiff's early medical records, and applies an interpretation of Dr. Winer's opinion that is similar to Plaintiff's, which is not supported by the record.  Finally, even if the phone call referenced by Dr. Vanna is excluded from his report, his analysis of her records is both internally consistent and consistent with the opinions provided by the other experts involved in this case, and is even consistent with the IME performed by Dr. Cremer, who also believed that Plaintiff could return to work with proper pain mitigation.  (See, supra, p. 13.)

In sum, Plaintiff has not been able to demonstrate, in her appeal to the committee or in her argument to this Court, that she is disabled, or that Defendant decided her claim arbitrarily.  For the reasons stated above, the Court finds that the review of her LTD claim was decided as part of a principled reasoning process, and is supported by substantial evidence in the record.

### 2.    File review

Plaintiff contends that the Plan erred in permitting its experts to conduct file reviews rather than physical examinations during the review process leading up to the initial denial of benefits.[9]  Sixth Circuit case law does not require that a court find that a file review is per se inadequate.  *Calvert*, 409 F.3d at 296 (holding that a plan with discretion to conduct a physical examination is not required to do so); *see also Bennett*, 514 F.3d at 554.  However, when a plan has discretion to conduct a physical examination, the court must consider the possibility that the decision to rely upon a file review is indicative of problems with the thoroughness or accuracy of that review.  *See Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006).

The reviewing physician in *Calvert* was asked by the plan administrator to consider all of the plaintiff's medical records.  The court concluded that he did not conduct a complete review, as there were large gaps and contradictions in his report.  *Calvert*, 409 F.3d at 296-97.

---

[9] It appears to be Plaintiff's argument that the Plan language does not permit file reviews.  As discussed above, the actual language of the Plan requires an examination at the "Named Fiduciary's request" and gives that fiduciary discretion regarding such an examination.

Furthermore, the reviewing physician based much of his report on credibility determinations that he made without ever having met or talked with the plaintiff.  *Id.*

The contents of the reports submitted to Liberty by Drs. Brown and Mirkin are outlined above in the fact statement.[10]  It is clear from those reports that the reviewing physicians in this case did not commit the same errors as the expert in *Calvert*.  First, both Dr. Brown and Dr. Mirkin outlined carefully which records they reviewed and the contents of those records.  Those reviews were comprehensive and included the 2001 through 2003 medical records that Plaintiff has relied on, as well as the later medical records that contemplate Plaintiff's return to work. Second, unlike the reviewing physician in *Calvert* whose report conflicted with the records of the plaintiff's physicians, the reviewing physicians in this matter expressed opinions in concert with the most recent recommendations and opinions of Plaintiff's own treating physicians.  To the extent that Dr. Mirkin disagreed with the mental health professionals who examined Plaintiff, it was because their reports markedly conflicted with Paintiff's own reports about her activities and capacity.  Finally, neither Dr. Brown nor Dr. Mirkin attempted to make determinations about Plaintiff's credibility.[11]

Plaintiff contends that Dr. Brown could not conduct the review in this case objectively because she was a "notorious insurance company consultant" who "only works for insurance companies."  However, based upon the Court's review of her report and of Plaintiff's other medical records, there does not appear to be a conflict between Dr. Brown's conclusion and that

---

[10] There are other medical evaluations in this case.  One was an IME in 2003 by Dr. Stephen Cremer, the Plan's expert, which has been addressed in the previous section.  The others were evaluations by vocational and psychological experts that were conducted in conjunction with Plaintiff's appeal of the denial of benefits.  Some of these were taken by the Plan's experts; one was taken by Mr. Cody, a vocational expert hired by Plaintiff to opine for purposes of supporting her appeal.  All of the reports produced for the appeal will be discussed when the appeal process is discussed.

[11] The Court also notes that Liberty's denial notification does not refer to Dr. Brown's report at any point.  Instead, Liberty indicates that it relied upon Plaintiff's treating physician's records, the report of Dr. Mirkin, and the report of the vocational expert.

18

Plaintiff's own treating physicians.  This argument is therefore unpersuasive.  The Court finds that the paper file review was not improperly undertaken or conducted, and that it does not indicate that the review was inaccurate or inadequate.

### 3.  Social Security determination

Plaintiff properly notes that the SSA found that Plaintiff was disabled, issuing its opinion on September 5, 2006.  (AR 673-675).  However, Plaintiff disregards the fact that the SSA first issued an opinion on October 19, 2004, in which the Administrative Law Judge found Plaintiff not to be disabled.  (AR 904-917).  There are no reasons stated in the 2006 opinion for the reversal of this judgment.

The *Glenn* court has held that the failure of a plan administrator to discuss a disability determination by the SSA may be considered as a factor in determining the arbitrariness of the plan's decision to deny benefits.  *Glenn*, 461 F.3d at 669; *see also Calvert*, 409 F.3d at 295.  However, such a determination is not dispositive of the LTD benefits decision, particularly when there is no explanation of the determination and the evidence supporting it.  *See, e.g., Mitchell v. The Hartford*, 2006 U.S. Dist. LEXIS 37350 at *15-16 (W.D. Ky, June 6, 2006).

It is particularly noteworthy that at the time the Plan Administrator made the decision to deny Plaintiff's LTD benefits, the SSA had found her not to be disabled, and had issued a lengthy opinion in support of its determination.  Therefore, at the time the original decision was made by the Plan Administrator it was not in conflict with the SSA's finding.  Two years later, after the denial of LTD benefits and in the midst of Plaintiff's appeal to the Plan's review committee, the SSA revisited its opinion and, without any explanation, determined that Plaintiff was disabled.  The only effect this would have had on the determination of Plaintiff's LTD benefits would have been on appeal.  However, when the SSA's opinion cites no evidence and

provides no basis for its reasoning, this Court is hard-pressed to determine that the Plan Administrator decided incorrectly based upon the SSA's determination, and does not so find.

### 4. Conflict of interest

When the decision-maker that determines which claims are covered is the same entity as the payor of those claims, the courts have held that a potential conflict of interest exists. *Calvert*, 409 F.3d at 293. However, such a situation does not *per se* create a conflict of interest, and is simply to be considered as one of the factors in the court's analysis under the arbitrary and capricious standard. *Id.*; *see also Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 694 (6th Cir.1989) (citing *Firestone*, 489 U.S. at 115). In a case in which an expert is retained by the Plan Administrator, a similar conflict may exist because of that expert's likelihood of finding in favor of the entity providing compensation for his services, or the Plan's likelihood of contracting with an expert who would find in its favor. *See Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527-28 (6th Cir. 2003) (*overruled on other grounds*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)).

Plaintiff contends that such a situation existed here, and that it was compounded by the use of medical experts who were paid by the Plan Administrator, both for the initial review as well as for the review on appeal. While it is true that the Plan Administrator in this case was the same as the payor of the funds, having weighed that fact as one of the factors in its analysis, this Court finds that the decision made in this case was not arbitrary or capricious. As reiterated above, the decision ultimately reached in the initial review process accorded with both Plaintiff's treating physician's opinion and the SSA's original decision. Although Plaintiff has attempted to

demonstrate to the Court that Dr. Brown was in league with the Plan Administrator[12], the Court has found that Dr. Brown supported her conclusions with the opinions of Plaintiff's physicians, and that her opinion was not unreasonable.  Plaintiff's argument regarding a conflict of interest is unpersuasive.

>        **D.**        **Notice and Hearing**

Plaintiff has argued that the notice provided to her by the Plan regarding the termination of her LTD benefits was inadequate to inform her of the reasons for the denial and of the appeal procedure.  According to statute, a Plan Administrator that denies an employee's claim for benefits must inform that employee in writing of the specific reasons for the denial, and must also afford that employee a reasonable opportunity for a full and fair review of that decision.  *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560-503-1.  Plans are held to a substantial compliance standard under this statute.  *See Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 808 (6th Cir. 1996).

The letter sent by Liberty to Plaintiff specified which medical records it had relied upon in reaching its decision, as well as the specific findings supporting that decision.  The first records identified by Liberty were those of Dr. Winer, Plaintiff's treating physician, from January and April 2006.  It noted briefly that it had relied upon Dr. Mirkin's file review, and then discussed the report of the vocational expert, noting specific findings from that report.

After its reiteration of the medical findings and its conclusion, Liberty laid out what Plaintiff was required to do in order to appeal the decision:

> You may appeal this denial . . . Your written request for review must be sent within 180 days of your receipt of this letter.  Your letter should state the reasons you feel your claim should not have been denied.  Include documentation such as dates of additional treatment, corresponding notes, diagnostic test results, objective medical findings, and any other materials which you feel will support

---

[12] Plaintiff has attached as exhibits to her Motion for Benefits both Dr. Brown's CV and a deposition of Dr. Brown in an unrelated matter in an attempt to support her claim of bias.  Defendant has moved to strike those exhibits.  This issue will be addressed below.

your claim.  You may request, free of charge, copies of all documents, records and other information relevant to your claim and a list of the medical and/or vocational experts, if any, consulted in connection with the claim denial.

(AR 415).

Plaintiff again insists that Liberty has misrepresented Dr. Winer's conclusions regarding Plaintiff's ability to perform a sedentary task, which makes the denial notification misleading and therefore insufficient.  The Court is not persuaded.  Simply put, the notice regulations set forth in 29 C.F.R. § 2560.503-1 have been satisfied by the denial letter:  it has informed her of the determination and the reasons therefor, it has cited the plan provisions under which it has made its determination, and it has given a list of information Plaintiff could provide in her appeal process.  The Court finds that the notification provided to Plaintiff was sufficient to inform her of the Plan Administrator's decision, and to provide her with a description of the process for appealing that decision.

### E.    Reimbursement to Defendant for benefits paid

Defendant was granted leave to amend its Answer to add a Counterclaim on December 12, 2007.  In its Counterclaim, Defendant sought a reimbursement of the benefits paid to Plaintiff based upon the social security benefits she received for the same time period.  Plaintiff has responded that Defendant is estopped from seeking such a reimbursement.  The Court reserves judgment on this issue due to the paucity of evidence in the record.  In a separate entry to be filed subsequent to this opinion, the Court will set the matter for a hearing in order for the parties to have an opportunity to present argument.

## II.    Motions to Strike

Plaintiff attached to her Motion for Benefits both the CV of Dr. Brown, Defendant's medical expert, as well as a deposition in an unrelated case, neither of which was part of the

Administrative Record.  (Doc. 40-2, 40-3.)  Defendant moved to strike these exhibits on the grounds that no evidence outside of the Administrative Record may be considered by a reviewing court.  (Doc. 46.)  In response to Defendant's Motion to Strike, Plaintiff contended that such evidence could be considered by the Court in order to show Dr. Brown's bias.  (Doc. 49.)

The concurring opinion in *Wilkins* contemplated that evidence outside of the administrative record could be considered when that evidence "is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part."  *Wilkins*, 105 F.3d at 618 (Gilman, J., concurring).

While the Court acknowledges the discussion in the *Wilkins* concurrence, Plaintiff makes no argument in her Motion for Benefits, the motion to which these exhibits are attached, regarding the alleged bias of Dr. Brown.  She has made passing references to the exhibits, but not in the form of any sort of argument.  Moreover, the deposition she has attached is forty pages long, and she makes no attempt to direct the Court's attention to the specific portions of the transcript that would support any contention she might have made that Dr. Brown was biased.  In the absence of any discussion or argument from Plaintiff, who claims to have intended that the Court should review Dr. Brown's decision for bias but has made no effort to argue the point, the Court GRANTS Defendant's Motion to Strike Plaintiff's Exhibits (Doc. 46).

## CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Judgment Awarding Benefits, and GRANTS Defendant's Motion for Judgment on the Administrative Record insofar as Defendant has moved that this Court find that it properly terminated Plaintiff's

disability benefits.  It reserves judgment on the issue of the reimbursement of funds received by

Plaintiff in the form of social security.  Finally, it GRANTS Defendant's Motion to Strike the

exhibits attached to Plaintiff's Motion for Judgment Awarding Benefits.

IT IS SO ORDERED.


DATED:  April 25, 2008              */s/ John R. Adams*
                                   Judge John R. Adams
                                   UNITED STATES DISTRICT COURT